WESTERN MARYLAND RAILROAD COMPANY

VS.

BALTIMORE AND OHIO RAILROAD COMPANY.

*George R. Gaither, Edgar H. Gans, Alex. G. Cochran, Benj. A. Richmond* and *Lawrence Greer* for plaintiff.

*John G. Wilson* and *W. Irvine Cross* for defendant.

302

DOBLER, J.—

In this suit the plaintiff railroad company seeks in a Court of equity to compel the defendant railroad company to specifically perform the several undertakings set out in a contract between the parties exhibited with the bill, and to account for the loss of revenue and profit to the plaintiff in consequence of the diversion of freight and traffic by the defendant in violation of said contract. Testimony was taken to cover every possible point of attack and defense, to make the record complete for the ultimate decision of the questions involved. From the pleadings and the mass of testimony certain facts are clearly established. The plaintiff company was chartered to construct and to operate a railroad running from Baltimore city westwardly through the State of Maryland to Hagerstown, and thence to Cumberland to Alleghany county, and prior to December 28th, 1889, had built its lines from Baltimore to Edgemont, and from thence to Hagerstown, and from thence to Williamsport, which was then the westernmost terminus of its main line. It also had a line leased or controlled by it, the Baltimore and Cumberland Valley Railroad, from Edgemont to a connection with the Harrisburg and Potomac Branch of the Philadelphia and Reading Railroad at Shippensburg, Pa. It became apparent to the plaintiff and defendant that with proper railroad connections and facilities between Shippensburg, Hagerstown, Williamsport and Cherry Run Station on the defendant's road a short, convenient railroad connection could be made between Cherry Run and the system of the Philadelphia and Reading Railroad Company so that freight being shipped by way of Cherry Run, west or east, over the defendant's line, or being shipped west or south over the Philadelphia and Reading Railroad to Shippensburg, would be afforded a short, easy and convenient route by way of Hagerstown and Williamsport between the system of the defendant and what is known as the Reading system. Such a line between Cherry Run and Shippensburg would afford a much more direct and convenient connection than the route theretofore used in the interchanges between the defendant's system and that of the Reading Railroad via Weverton and Hagerstown. It was also apparent that if a cut-off line from a point on the plaintiff's main line at or near Hagerstown to a suitable point on its Baltimore and Cumberland Valley line near Altenwald were constructed the distance from Cherry Run to Shippensburg would be considerably shortened and the connection between the two systems greatly improved.

On the 23rd of December, 1889, a contract was executed by the parties to this suit, wherein after reciting the defendant's desire to obtain 'a more direct connection between its main line in the vicinity of Cherry Run Station and Hagerstown, and points upon the plaintiff's road and portions of the Reading system; and the plaintiff's purpose to have constructed a connection between its main line from Williamsport to Cherry Run, and to shorten its line by the construction of a cut-off line as above mentioned as soon as the business interchange by this route between the defendant and the Reading Company assumes such proportions as to justify the construction of such new line, and the belief of both parties that great advantage will result to them from the completion of said connecting links and the uniting of their respective systems as friendly connecting lines for the interchange of business, it was stipulated as follows:

1. The plaintiff "shall proceed with all due diligence to secure the construction of the proposed connection" between the main lines of the respective parties, and the plaintiff will construct the proposed cut-off line whenever the business inaugurated by the route via Edgemont between the defendant and the Reading system has assumed proportions to warrant the construction of such a line, the time for the latter in case of disagreement to be determined by referee.

2. The parties agree to operate their railroads as connecting lines and to freely interchange business with each other, as soon as the proposed connecting link between Williamsport and Cherry Run has been completed; that rates and the division of rates between the parties shall be established, and that neither the provisions of this article, nor any provision in this agreement shall be at any time held or taken to require either of the parties to divert business to the lines of the other, which it is now bound by contract to deliver to other lines of transportation, or forward by other routes,

nor business for which it can furnish a route to destination, or for a greater distance by its own lines; this latter provision, however, not to be availed of by the defendant to continue the handling of joint business to or from Cherry Run, by the route via the Washington County Railroad, after the Williamsport and Cherry Run line has been completed; that it is understood and agreed, however, that should the plaintiff elect to do so, or be required to construct the proposed cut-off line above mentioned, then the defendant shall thereafter use such improved line, between Cherry Run and Shippensburg, and cause it to be used, as far as it can control, for all interchanges of business made in the Cumberland Valley between the defendant and Reading System, except such interchanges as may be made by the use of what is called the Hyndman line (not as yet constructed, this provision, however, not to interfere with the receipt from or the delivery to the defendant by the plaintiff at Hagerstown of any business interchanged between the Reading and plaintiff systems and the Washington County Valley and Metropolitan Branches of the defendant.

3. That the defendant agrees to facilitate in every practicable way the connection between its tracks and those to be provided by the plaintiff at Cherry Run, so that there may be no delay in making such connection nor in operating it, and interchanging business by it when made, that each company will provide its due proportion of the facilities at the proposed point of junction, and should either party find it necessary or desirable to have established any facilities or accommodations contiguous to the tracks of the other which shall not be intended for joint use, there shall be proper co-operation upon the part of the other to do so.

4. That settlements shall be made each month.

5. That each party agrees to furnish cars for joint business as nearly as practicable in proportion to interested mileage, and that it will move with promptness and dispatch all joint traffic conducted under this agreement, and will return the empty cars pertaining to such traffic.

6. That all questions of difference arising under the operations of the agreement shall be settled by disinterested referees.

7. That the agreement shall take effect from its execution, and shall remain and continue in force until terminated by mutual consent.

The line between Cherry Run and Williamsport was opened for business in September, 1892. A large volume of business at once began to pass over the new route. This constantly increased so that in 1898 and 1899, the Altenwald cut-off line was constructed, In 1898, an agreement was entered into between the parties to this suit and the Philadelphia and Reading Railroad Company, (defendant's exhibit No. 1,) under which also interchange of business was conducted over the lines of the plaintiff's road until August 31st, 1902, after notice from the defendant of its intention to terminate said agreement, as therein provided.

In the year 1889, it was not practicable for the defendant in this suit to have made any arrangement by which traffic between Cherry Run and Shippensburg could have been handled with profit to the defendant, via Martinsburg over the Cumberland Valley Railroad, a company then, and now controlled by the Pennsylvania Railroad Company. In the year 1889, and as late as 1898, the West Virginia Central and Pittsburgh Railway Company was regarded as a connection of the defendant company. In 1901, the Pennsylvania Railroad Company had acquired about forty per cent. of the capital stock of the defendant company. Early in the year 1902, it became apparent that the control of the plaintiff company was about to pass from the City of Baltimore into other hands. The Act of Assembly of 1902, Chapter 129, approved and in effect March 29th, 1902, required the purchaser of the city's interest in the plaintiff road to extend its railroad facilities, or to supply and furnish railroad connections facilities in connection with the plaintiff to the coal regions of Western Maryland, West Virginia or Pennsylvania, to be begun within two years, and to be completed within eight years after the sale. The present owners of the stock of the plaintiff acquired full control thereof in June, 1902.

From the opening of the connection between Cherry Run and Williamsport in 1892, until the construction of the Altenwald cut-off in 1899, and up to the 1st day of September, 1902, the

parties to the agreements of 1889 and 1898 had no serious difficulty. There were times when the plaintiff's line was congested, and times when the traffic on the defendant's line was overcrowded, owing to a variety of causes, chiefly the unprecedented demand for bituminous coal during the extensive strikes in the anthracite coal regions. Occasionally friction arose between subordinates of the respective parties, but neither company ever notified the other of any failure to meet contract obligations nor expressed any desire or purpose to abrogate or rescind their contracts until the summer of 1902.

On the 7th of July, 1902, immediately after the election of the president and vice-president of the plaintiff company these officers visited the office of Mr. Loree, president of the defendant company, the object of their visit being "to take up with Mr. Loree the question of using the tracks of the defendant, between Cumberland, Md., and Cherry Run, by the plaintiff, on the usual basis that such arrangements are made between railroads." Mr. Loree replied that he had no intention of delegating the use of any portion of the defendant's line for that purpose. The construction by the plaintiff of a line from Cumberland to Cherry Run was then submitted to Mr. Loree as an alternative. This was not regarded with favor by the latter. Sometime between January 17th and May 1st, 1903, the formal order was passed directing the construction by the plaintiff of its extention from Cherry Run to Cumberland.

About the time defendant gave notice of its intention to withdraw from what is known as the tri-partite agreement dated June 13th, 1898, it arranged for a new routing of traffic by way of the connection of the Cumberland Valley Railroad with its own line at Martinsburg, by which new through route it might carry freight for a greater distance over its own line and earn an increased proportion of its revenue. As a result of the opening of this new route there has been a marked diminution in volume of traffic passing over the plaintiff's line between the system of the defendant and the Reading system, with a corresponding loss of revenue and profit to the plaintiff. There can be no doubt that the opening of the Martinsburg route was an act of the defendant taken deliberately with the expectation of bringing about the conditions shown in the evidence that have resulted therefrom. If such action constitutes a breach of the contract of December, 1889, the defendant is responsible therefor. Neither the desire of the Cumberland Valley Railroad to share in the traffic interchanged in the Cumberland Valley between the defendant and the Reading System, nor even the clamor of shippers for an additional route can release the defendant from its obligations under its contracts. The defendant contends that the contract of December 23rd, 1889, was abrogated or superseded by what is known as the tripartite agreement of June 13th, 1898, and suggests, but prefers not to rely thereon in its answer, that even if the former contract be still in force, the defendant may be justified in its action in the premises, under what is called the "Longer Haul" clause of the second article of said contract.

I find myself unable to agree with the counsel for the defendant as to the relative strength of these two defenses. The plaintiff had, in June, 1898, a contract with the Reading Railroad Company, dated February, 28th, 1898, which, in many respects, was as far reaching in its effects as the contract of 1889 with the defendant. The tripartite agreement did not in its terms undertake to repeal either of the two permanent contracts; but s i m p l y brought together for a year, (and thereafter subject to termination upon thirty days' notice) into an agreement to use the then existing line of the plaintiff, the parties who had previously agreed to use permanently the cutoff line when constructed. It is impossible to believe that either of the parties thereto at that time desired to shake off any of the obligations arising out of either of the above mentioned permanent contracts. The tripartite agreement did not supersede the former contract between the parties to this suit.

We find the "Long Haul" provision in the second article, the vital operative article of the contract of 1889. This article is readily divisible into three (3) parts. The first sets forth the agreement of the parties to operate their railroads as friendly connecting lines, and to freely exchange business with each other as soon as the proposed connecting link between Williamsport and Cherry Run has been completed.

The third states that it is understood and agreed, however, that should the plaintiff elect to do so or be required to construct the proposed cut-off line, then the defendant shall thereafter use such improved line between Cherry Run and Shippensburg, and cause it to be used as far as it can control, for all interchanges of business made in the Cumberland Valley, between the defendant and the Reading System, except such as may be made between those systems by a proposed Hyndman line (which has never been constructed,) and declares that this is not to interfere with the receipt from, or delivery to the defendant by the plaintiff at Hagerstown, of business interchanged between the Reading and the plaintiff's systems, and certain branches of the defendant.

The second provides for the rates and the division of the rates on traffic, and declares that "neither the provisions of this article nor any provision of this agreement shall be at any time held or taken to require either of the parties to divert business to the lines of the other, which it is now bound by contract to deliver to other lines of transportation, or forward by other routes, business for which it can furnish a route to destination, or for a greater distance, by its own lines;" this latter provision however, not to be availed of by the defendant to continue the handling of joint business to or from points west of Cherry Run, by route via the Washington County Railroad, after the Williamsport and Cherry Run line has been completed.

Transposing the second and third sections does no violence to the article, and avoids the necessity of enlarging upon the force and effect of the word "however" in the early part of the third section. No further difficulty of construction will be encountered. In 1889, it was the purpose of both parties to establish friendly relations as far as the interchange of business at Cherry Run was concerned. If this business should grow so as to justify the building of the cut-off line. it would be to the manifest interest of both parties for this friendly relationship to be more firmly cemented. There would be no occasion for the plaintiff to extend its line to Cumberland or in any other direction to tap the trade of the defendant, nor had the defendant any expectation of maintaining

other than strictly competitive relations with the Cumberland Valley Railroad and the great system which controlled it, nor had the defendant any idea of building or leasing any other line to parallel the line of the plaintiff, nor of using the old line from Weverton to Hagerstown again for interchanges with the Reading System of traffic passing Cherry Run. The "longer haul" clause had immediate reference, doubtless, to exchanges not in the Cumberland Valley (via Ellesmere Junction and Park Junction), but the seventh article provided that the agreement then made should "remain and continue in force until terminated by mutual consent." In view of the changes and mutations of human affairs, and in no department of human activity are changes more frequent and kaleidoscopic than in the combinations of railroad interests, ordinary prudence would dictate the insertion of a provision to enable either party to meet conditions and emergencies unforeseen, but likely to arise during the running of a contract perhaps for all time. Courts are disinclined to construe such permanent contracts invalid as against public policy.

When, however, such a contract comes to be enforced full effect must be given if possible, to every provision; to those which would charge and to those which would relieve either party. What was styled in the argument "the equity of the situation" seems to demand for the defendant a construction that will relieve from blame, if not justify, the opening of the Martinsburg route.

Assuming that the plaintiff was and is able to handle satisfactorily the business which hitherto came along the defendant's line at Cherry Run to be interchanged in the Cumberland Valley for Reading points, and that it will continue so, it must be borne in mind that the defendant faithfully executed its part of the contract long after its relations with the Pennsylvania Railroad mentioned in the bill and its own interest growing thereout might be supposed to have influenced its conduct; whereas the plaintiff caused its charter to be so modified by the General Assembly of Maryland as to oblige it to alter its relations towards the defendant; promptly announced its purpose to change those relations; and upon failure to secure a trackage agreement with the defendant, began to

build the extension of its line from Cherry Run to Cumberland to divide the traffic for the joint handling of which as friendly, (not competitive), connecting lines the agreement of 1889 as well as that of 1898 was executed. The actions of the plaintiff in these particulars are defended by its counsel, not because they are in fact in perfect accord with the "longer haul" provisions of Article 2, but because they are not in conflict with any express obligation of the plaintiff set out in the contract. I prefer to vindicate the conduct of both parties in the premises by reference to the "longer haul" provision.

The opening of the Martinsburg route is the serious charge against the defendant in this case. All the freight diverted from the plaintiff's line, mentioned in the bill and in the evidence, was carried over the Cumberland Valley Road. In my opinion the opening of this new through route, involving the interchange of business, shown in the evidence, was no breach of the contract of 1889, and the plaintiff's case can not be maintained, for though the defendant has not insisted in its answer, as forcibly as subsequently in the argument, upon the longer haul provision of the contract, a Court of Equity will not grant relief by any of specific performance nor by injunction unless a breach of obligation has been or is about to be committed.

The bill will therefore be dismissed.